IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA ex rel. Attorney General Mark Brnovich,
*Plaintiff/Counter-Defendant/Appellant,*

*v.*

MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT BOARD,
*Defendant/Appellee,*

ABEL BADILLO and BIBIANA VAZQUEZ, *Intervenor-Defendants/Counter-Plaintiffs/Appellees.*

No. 1 CA-CV 15-0498
FILED 6-20-2017

Appeal from the Superior Court in Maricopa County
No. CV2013-009093
The Honorable Arthur T. Anderson, Judge

**REVERSED AND REMANDED WITH INSTRUCTIONS**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Kevin D. Ray, Rusty D. Crandell
*Counsel for Plaintiff/Counter-Defendant/Appellant*

Osborn Maledon, P.A., Phoenix
By Mary R. O'Grady, Lynne C. Adams, Eric M. Fraser
*Counsel for Defendant/Appellee*

Ortega Law Firm PC, Phoenix,
By Daniel R. Ortega, Jr.
*Co-Counsel for Intervenor-Defendants/Counter-Plaintiffs/Appellees*

Miller, Pitt, Feldman & McAnally, P.C., Phoenix
By José de Jesus Rivera, Nathan J. Fidel
*Co-Counsel for Intervenor-Defendants/Counter-Plaintiffs/Appellees*

Mexican American Legal Defense and Educational Fund, Los Angeles, CA
By Victor Viramontes, Martha L. Gomez
*Co-Counsel for Intervenor-Defendants/Counter-Plaintiffs/Appellees*

Law Office of Noel Fidel, Phoenix
By Noel Fidel
*Co-Counsel for Intervenor-Defendants/Counter-Plaintiffs/Appellees*

---

**OPINION**

Presiding Judge Kenton D. Jones delivered the Opinion of the Court, in which Judge Paul J. McMurdie joined and Judge Patricia K. Norris specially concurred.

---

**J O N E S**, Judge:

¶1        In 1996, Congress enacted two federal statutes intended to restrict welfare and public benefits for aliens.  The Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) defines which aliens qualify for eligibility to receive state and local public benefits.  Although PRWORA also generally allows the states to define alien eligibility for public benefits, part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) does not allow any state to provide non-qualified aliens with postsecondary education benefits based upon their residence within the state.  Ten years later, Arizona voters passed Proposition 300 (Prop 300) which, in relevant part, incorporates IIRIRA's prohibition on providing the quintessential residence-based, postsecondary education benefit — in-state tuition — to non-qualified aliens.

**¶2**         In 2012, the U.S. Department of Homeland Security (DHS), through a lawful exercise of its prosecutorial discretion, elected to defer deportation of unauthorized aliens who entered the country as children, a departmental policy otherwise known as Deferred Action for Childhood Arrivals (DACA).   Congress permits DHS to issue employment authorization documents (EADs) to DACA recipients but has not specified whether DACA recipients qualify for in-state tuition or other state and local public benefits.   Thereafter, the Maricopa County Community College District (MCCCD) began accepting EADs from DACA recipients as evidence that they qualified for residence-based, in-state tuition benefits. The Arizona Attorney General (AAG) objected, but the trial court upheld MCCCD's actions in a subsequent declaratory action.

**¶3**         The AAG now appeals the trial court's orders denying its motion for judgment on the pleadings and granting summary judgment in favor of MCCCD and partial summary judgment in favor of Abel Badillo and Bibiana Vazquez (the Students).   In reconciling federal and Arizona law, we hold DACA recipients are not eligible to receive in-state tuition benefits and therefore reverse the court's orders and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

**¶4**         In June 2012, DHS initiated the DACA policy, which allowed DHS to defer the removal of certain unauthorized aliens[1] and redirect immigration enforcement resources away from those individuals who lacked unlawful intent in entering the United States and have since demonstrated productive use of their time. *See generally* Memorandum from Janet Napolitano, Sec'y, DHS, to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Patrol, Alejandro Mayorkas, Dir., U.S. Citizenship & Immigration Servs., and John Morton, Dir., U.S. Immigration & Customs Enf't (Jun. 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (Napolitano Memo).  DACA originally applied to unauthorized aliens who: (1) came to the United States under the age of sixteen; (2) had continuously resided in the United States for at least five years preceding DACA's

---

[1]         Unauthorized aliens are those who "enter[] a country at the wrong time or place, elude[] an examination by officials, obtain[] entry by fraud, or enter[] into a sham marriage to evade immigration laws"; we use the term "unauthorized" as a substitute for "illegal" because the latter term has developed a pejorative connotation.  Black's Law Dictionary (10th ed. 2014).

institution; (3) were not older than thirty before June 2012; (4) were currently in school, had graduated from high school or received a GED, or had been honorably discharged from the U.S. military; and (5) had not been convicted of a felony or significant or multiple misdemeanors. *Id.* Individuals qualifying for deferment under DACA are required to apply for an EAD from the United States Citizenship and Immigration Services (USCIS). *See* 8 C.F.R. § 274a.12(c)(14).

¶5        Shortly after the implementation of DACA, MCCCD began accepting EADs from DACA recipients as evidence of residency for purposes of receiving in-state tuition benefits. In 2013, the AAG filed a declaratory action, seeking a determination that MCCCD's policy violates Arizona law and an injunction prohibiting MCCCD from allowing DACA recipients to obtain subsidized tuition rates. The Students, two DACA recipients attending MCCCD colleges and benefitting from in-state tuition benefits, successfully intervened and asserted constitutional defenses in addition to MCCCD's statutory defenses.

¶6        Both MCCCD and the Students filed motions for summary judgment. After briefing and oral argument, the trial court concluded that, under the relevant federal and state law, DACA recipients are "lawfully present" and therefore eligible for in-state tuition benefits. Because it granted Appellees' motions on statutory grounds, the court did not decide the constitutional claims presented in the Students' motion. The AAG timely appealed. This Court has jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) §§ 12-120.21(A)(1)[2] and -2101(A)(1).

## DISCUSSION

### I.    The AAG's Authority to Bring Suit

¶7        As an initial matter, MCCCD argues the trial court's orders must be affirmed because the AAG had neither statutory nor constitutional authority to initiate its suit. Whether a party has standing to sue presents a question of law we review *de novo. Pawn 1st, L.L.C. v. City of Phx.*, 231 Ariz. 309, 311, ¶ 11 (App. 2013) (citing *Ctr. Bay Gardens, L.L.C. v. City of Tempe City Council*, 214 Ariz. 353, 356, ¶ 15 (App. 2007)).

---

[2]        Absent material changes from the relevant date, we cite a statute's current version.

¶8		The AAG's powers derive solely from the Arizona Constitution or Arizona statutes. *State ex rel. Woods v. Block*, 189 Ariz. 269, 272 (1997) (quoting *Fund Manager, Pub. Safety Pers. Ret. Sys. v. Corbin*, 161 Ariz. 348, 354 (App. 1988), and citing *Ariz. State Land Dep't v. McFate*, 87 Ariz. 139, 142 (1960)). In asserting its authority to pursue this litigation, the AAG relies upon A.R.S. § 41-193(A)(2), which states "[a]t the direction of the governor or when deemed necessary by the attorney general, [the AAG shall] prosecute and defend any proceeding in a state court . . . in which the state or an officer thereof is a party or has an interest." This section "does not permit the Attorney General, in the absence of specific statutory power, to initiate an original proceeding." *McFate*, 87 Ariz. at 140, 145.

¶9		We find no law, however, prohibiting the chief executive of Arizona from directing a lesser executive officer to enforce a statute. Indeed, Arizona's governor is tasked with supervising the official conduct of all State officers and "is obligated and empowered to protect the interests of the people and the State by taking care that the laws are faithfully executed." *Yes on Prop 200 v. Napolitano*, 215 Ariz. 458, 470, ¶ 35 (App. 2007) (quoting *McFate*, 87 Ariz. at 148); *see also* Ariz. Const. art. 5, § 4; A.R.S. § 41-101(A)(1). Therefore, "the governor's order is the highest executive voice within this state and may not be ignored by a lesser officer of the executive branch." *Id.* (quoting *State v. Hooker*, 128 Ariz. 479, 481 (App. 1981)).

¶10		Here, after the AAG filed this action, then-Governor Jan Brewer directed the AAG to take "all legal actions" to enforce the laws regarding aliens' eligibility for in-state tuition benefits, which she interpreted as proscribing students without lawful immigration status from receiving in-state tuition benefits or other financial aid, and to continue this litigation to its conclusion. The Governor had an interest in the outcome because, by virtue of her position, she was obligated to protect the public's interest by ensuring the laws were faithfully executed. With that interest in mind, the Governor directed the AAG to "prosecute" the current proceeding within the meaning of A.R.S. § 41-193(A)(2).

¶11		Contrary to MCCCD's contention, there is no evidence the Governor used the take-care clause of the Arizona Constitution, *see* Ariz. Const. art. 5, § 4 ("The governor . . . shall take care that the laws be faithfully executed."), to create statutory standing for the AAG, thereby making a legislative decision in violation of her executive authority, *see Litchfield Elementary Sch. Dist. No. 79 v. Babbitt*, 125 Ariz. 215, 220 (App. 1980) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952)). Pursuant to her constitutional and statutory authority as chief executive, the Governor ordered the AAG to serve as her proxy in enforcing Arizona's

laws. The AAG, therefore, had a legal right, derived from the Governor's command, to seek a judicial determination that MCCCD acted unlawfully. We conclude the AAG had standing to bring the underlying declaratory and injunctive actions against MCCCD.

## II. DACA Recipients' Eligibility for In-State Tuition

¶12        The AAG argues the trial court erred in interpreting state and federal law in a manner that permits DACA recipients to qualify for in-state tuition benefits. We review the interpretation and application of statutes *de novo*. *See John Munic Enters., Inc. v. Laos*, 235 Ariz. 12, 15, ¶ 5 (App. 2014) (citing *First Credit Union v. Courtney*, 233 Ariz. 105, 107, ¶ 9 (App. 2013)).

### A.    PRWORA, IIRIRA, and Prop 300: Defining Alien Eligibility for Welfare and Public Benefits

¶13        A brief examination of the history and content of the relevant federal and state statutes is instructive.

¶14        In 1996, Congress passed PRWORA, Pub. L. No. 104-193, tit. IV, §§ 400-51, 110 Stat. 2105, 2260-77 (1996) (partially codified as amended at 8 U.S.C. §§ 1601 to -1646), and IIRIRA, Pub. L. No. 104-208, div. C, § 505, 110 Stat. 3009, 3681 (1996) (codified as 8 U.S.C. § 1623). PRWORA was generally enacted "to remove the incentive for illegal immigration provided by the availability of public benefits," 8 U.S.C. § 1601(6), and specifically delineates which aliens are eligible for state and local public benefits, *see* 8 U.S.C. §§ 1621(a), 1641(b)-(c). In relevant part, PRWORA defines state and local public benefits as:

> [A]ny retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual . . . by an agency of a State or local government or by appropriated funds of a State or local government.

8 U.S.C. § 1621(c)(1)(B).

¶15        Under PRWORA, unless an alien is "(1) a qualified alien . . . , (2) a nonimmigrant[3] . . . , or (3) an alien who is paroled into the United States" for urgent humanitarian reasons or significant public benefit, he or she is not eligible for state or local public benefits.  8 U.S.C. §§ 1621(a), 1641(b).  "Qualified aliens" are statutorily defined to include: (1) aliens lawfully admitted for permanent residence; (2) aliens granted asylum; (3) refugees; (4) aliens whose deportations are withheld because removal would threaten the alien's life or freedom; (5) certain Cuban and Haitian entrants; (6) certain battered aliens, or their spouses or children; and (7) certain victims of sex trafficking.  8 U.S.C. § 1641(b)-(c).  For ease of reference, we refer to these groups, collectively, as qualified aliens.  We likewise refer to aliens who do not fit within these specifically defined groups as non-qualified aliens.

¶16        Although the individual states retain the authority under PRWORA to enact a statute that would affirmatively provide "an alien who is not lawfully present" eligibility for state and local public benefits "for which such alien would otherwise be ineligible under [8 U.S.C. § 1621(a)]," 8 U.S.C. § 1621(d),[4] this general grant of authority is limited by IIRIRA, which provides:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a).  IIRIRA has been interpreted as applying to in-state tuition benefits.  *See Martinez v. Regents of the Univ. of Cal.*, 241 P.3d 855, 865 (Cal. 2010) ("[Section 1623(a)] provides that illegal aliens are not eligible for in-state tuition rates at public institutions of higher education.") (quoting H.R. Rep. No. 104-828, at 240 (1996) (Conf. Rep.)); *see generally Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007) (presuming in-state tuition is a benefit

---

[3]        Nonimmigrants are legal temporary residents of the United States, the most common of which hold student or work visas.  *See* 8 U.S.C. § 1101(a)(15).

[4]        Congress also permitted the states to restrict the eligibility of qualified aliens for state public benefits, within certain limitations.  *See* 8 U.S.C. § 1622; *see also Arizona v. United States*, 567 U.S. 387, 394 (2012).

governed by IIRIRA but concluding the plaintiffs lacked standing to pursue a claim).

¶17 Ten years after PRWORA and IIRIRA were enacted, Arizona voters approved Prop 300 to ostensibly prohibit unauthorized aliens from receiving in-state tuition or educational financial aid derived from publicly appropriated funds. *See generally* Public Program Eligibility, 2006 Ariz. Legis. Serv. Sen. Conc. Res. 1031 (2d Reg. Sess.). Thus, pursuant to A.R.S. § 15-1803(B):

> In accordance with [IIRIRA], a person who [i]s not a citizen or legal resident of the United States or who is without lawful immigration status is not entitled to classification as an in-state student pursuant to [A.R.S.] § 15-1802 or entitled to classification as a county resident pursuant to [A.R.S.] § 15-1802.01.

Section 15-1825(A) similarly prohibits a student seeking postsecondary education in Arizona "who is not a citizen of the United States [or] is without lawful immigration status" from receiving "tuition waivers, fee waivers, grants, scholarship assistance, financial aid, tuition assistance or any other type of financial assistance that is subsidized or paid in whole or in part with state monies." Section 15-1825(B) further requires each community college and university to report the total number of students not entitled to educational financial aid because they are "not lawfully present."

¶18 In sum: (1) PRWORA grants eligibility for state and local public benefits only to "qualified" aliens who are "lawfully present," but separately permits the states, individually, to extend state and local public benefits to non-qualified aliens; (2) IIRIRA restricts the states' authority to extend a specific public benefit — residence-based, in-state tuition — to aliens "not lawfully present"; and (3) Arizona statutes, adopted at the direction of Arizona voters, affirmatively deny in-state tuition benefits to persons "without lawful immigration status." Whether DACA recipients are eligible for in-state tuition benefits turns on whether they are "lawfully present" within the meaning of the above statutes addressing eligibility for state and local benefits.

B.    Defining "Lawful Presence"

1.    A Coherent Statutory Scheme

¶19    MCCCD first argues that IIRIRA is the more specific statute relative to in-state tuition and thus controls over PRWORA's general provisions for state and local public benefits. MCCCD therefore contends we should disregard any discussion defining "not lawfully present" found in PRWORA. Basic principles of statutory interpretation instruct that "specific statutes control over general statutes," and, "when a general and a specific statute conflict, we treat the specific statute as an exception to the general." *Mercy Healthcare Ariz., Inc. v. AHCCCS*, 181 Ariz. 95, 100 (App. 1994) (citing *City of Phx. v. Superior Court (Derickson)*, 139 Ariz. 175, 178 (1984), and *Kearney v. Mid-Century Ins.*, 22 Ariz. App. 190, 192 (1974)). But we should only disregard PRWORA, as MCCCD asks us to do, if it truly conflicts with IIRIRA or the two cannot in any way be read together. *See Berndt v. Ariz. Dep't of Corr.*, 238 Ariz. 524, 528, ¶ 11 (App. 2015) (citing *Baker v. Gardner*, 160 Ariz. 98, 101 (1988)). We do not find that to be the case here, especially given our duty "to harmonize, whenever possible, related statutory and rule provisions." *Metzler v. BCI Coca-Cola Bottling Co.*, 235 Ariz. 141, 145, ¶ 13 (2014) (citing *State v. Hansen*, 215 Ariz. 287, 289, ¶ 7 (2007)).

¶20    IIRIRA can be construed within the entire statutory scheme as a restriction on PRWORA's general decree authorizing states to enact statutes granting state or local public benefits to non-qualified aliens. *See* 8 U.S.C. § 1621(d). First, the parties here do not dispute that the restriction within IIRIRA applies to in-state tuition benefits. *See supra* ¶ 16. And because in-state tuition is financial assistance provided by a postsecondary educational institution, such as a community college district or other local government agency, *see* Black's Law Dictionary (10th ed. 2014) (defining a "local agency" as "[a] political subdivision of a state," including "counties, cities, school districts, etc."); *see also McClanahan v. Cochise Coll.*, 25 Ariz. App. 13, 17 (1975) ("We hold that a community college district is a political subdivision of the state."), in-state tuition benefits fit within PRWORA's definition of a state or local public benefit, *see supra* ¶ 14; *see also Martinez*, 241 P.3d at 866 (analyzing, with regard to PRWORA, a state statute exempting certain unauthorized aliens from paying out-of-state tuition); *Ruiz v. Robinson*, 892 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012) (construing PRWORA as encompassing IIRIRA).

¶21    This construction is consistent with IIRIRA's placement within the general statutory scheme outlining eligibility for state and local

public benefits. "When statutes relate to the same subject matter, the later enactment, in the absence of any express repeal or amendment therein, is held to have been enacted in accord with the legislative policy embodied in [t]he earlier statute." *Desert Waters, Inc. v. Superior Court*, 91 Ariz. 163, 171 (1962) (citing *Frazier v. Terrill*, 65 Ariz. 131, 134 (1947), and then *United States v. Arizona*, 295 U.S. 174, 191 (1935)). MCCCD has not identified any divergent legislative policy that would justify reading IIRIRA outside of the general context of PRWORA. To the contrary, both IIRIRA and PRWORA reflect a general policy to encourage aliens to be self-reliant and reduce their burden on the public benefits system in accordance with national immigration policy. *See generally* 8 U.S.C. § 1601.

**¶22**　　　　By its subsequent enactment of IIRIRA, Congress was clarifying that PRWORA's eligibility provisions applied to in-state tuition benefits, while at the same time removing residence-based, in-state tuition from the class of public benefits a state may offer, under PRWORA, to non-qualified or unlawfully present aliens.[5] Because we reject MCCCD's argument that the provisions of IIRIRA supplant the provisions of PRWORA, we examine the meaning of "lawfully present" within the statutory scheme as a whole.

　　　　　　　2.　　*Chevron* Step 1: Congress Has Defined "Lawfully Present" for Purposes of Alien Eligibility for State and Local Public Benefits.

**¶23**　　　　Because this case involves DHS's policy regarding statutes it administers,[6] we must first ask "whether Congress has directly spoken to the precise questions at issue." *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)). If Congress has done so, we will give effect to Congressional intent and do not consider the agency's interpretation. *Id.* (citing *Chevron*, 467 U.S. at 842). "In determining whether Congress has

---

[5]　　　　Should a state extend residence-based, in-state tuition benefits to non-qualified aliens, IIRIRA requires the benefit be extended to *all* U.S. citizens and nationals, including those residing out-of-state, *see infra* ¶ 58, thereby defeating the state's ability to distinguish between students based upon their residency.

[6]　　　　The Department of Justice, through the Immigration and Naturalization Service (INS), was originally responsible for enforcing the immigration laws, but that responsibility has since been transferred to DHS. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation" because the meaning of certain phrases "may only become evident when placed in context." *Id.* (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994)).

¶24 The phrase "lawfully present" is only used twice within the statutory subchapter involving state and local public benefits and in-state tuition. *See* 8 U.S.C. §§ 1621(d), 1623(a). "A term appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf v. United States*, 510 U.S. 135, 141-43 (1994) (construing the term "willful" as it appears in different sections of the same subchapter) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992)). Although 8 U.S.C. § 1623(a), within IIRIRA, provides little guidance as to the meaning of the phrase, 8 U.S.C. § 1621(d), within PRWORA, equates aliens who are "not lawfully present" with non-qualified aliens — or those ineligible for benefits under 8 U.S.C. § 1621(a). *See supra* ¶¶ 15-16. Reading the statutes together, we conclude that only qualified aliens are "lawfully present" for purposes of receiving state and local public benefits.

¶25 Qualified aliens include alien-beneficiaries of some forms of discretionary and deferred-action relief.[7] *See supra* ¶ 15. However, not all

---

[7] DACA and other DHS deferred-action policies are exercises of administrative discretion in which immigration officials temporarily defer the removal of unauthorized aliens. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999); *DHS's Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. & to Defer Removal of Others*, 38 Op. O.L.C. 1, 12-13 (2014), https://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/20/2014-11-19-auth-prioritize-removal.pdf (Deferred Action Op.). Deferred action is one of multiple forms of discretionary relief; other forms of discretionary relief include parole, *see* 8 U.S.C. § 1182(d)(5)(A); asylum, *see* 8 U.S.C. § 1158(b)(1)(A); cancellation of removal, *see* 8 U.S.C. § 1229b; and temporary protected status, *see* 8 U.S.C. § 1254a. *See also Arizona*, 567 U.S. at 394; Deferred Action Op., 38 Op. O.L.C. at 5, 12 n.5. Although deferred action developed without express statutory authorization, *see Am.-Arab Anti-Discrimination*, 525 U.S. at 484 (citation omitted); USCIS Adjudicator's Field Manual ch. 40.9.2(b)(3)(J) (last updated Nov. 23, 2016), https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1.html (USCIS Manual), some deferred action policies have been codified by Congress, *see* 8 U.S.C. §§ 1101(a)(15)(T), (U), 1154(a)(1)(A), (D); Deferred Action Op., 38 Op. O.L.C. at 13, 15. Moreover, the U.S. Supreme Court

persons benefitting from discretionary and deferred-action relief are qualified aliens, as defined within 8 U.S.C. §§ 1621 and 1641; rather, discretionary and deferred-action relief recipients who are also defined as qualified aliens are emblematic of statutorily recognized groups who have suffered or will imminently suffer from violence or the effects of an emergency situation.   Nor are the beneficiaries of discretionary and deferred-action relief necessarily "lawfully present."  *See* Deferred Action Op., 38 Op. O.L.C. at 20 (describing deferred-action programs as "the toleration of an alien's continued unlawful presence").

¶26        DACA recipients have not been specifically recognized by legislative enactment and do not share these same acute humanitarian concerns.  *See id.* at 18 n.8 (noting DACA is "predicated on humanitarian concerns . . . less particularized and acute" than those underlying other deferred-action programs).  They are more aptly described as beneficiaries of an executive branch policy designed to forego deportation of those who lacked unlawful intent in entering the country and have, since their arrival, led productive lives.  However, even accepting DACA recipients' positive societal attributes, Congress has not defined them, or deferred-action recipients generally, as "qualified aliens" who are "lawfully present" and thereby eligible to receive in-state tuition benefits.

¶27        Appellees nonetheless urge us to adopt a definition of "lawfully present" buried within an unrelated immigration statute addressing alien eligibility to receive visas, 8 U.S.C. § 1182(a)(9)(B)(ii).  This section states:

> For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the [Secretary of DHS] or is present in the United States without being admitted or paroled.

8 U.S.C. § 1182(a)(9)(B)(ii).  By its own terms, this definition is specifically limited to the phrase "unlawfully present" as used within paragraph (9).  *Id.*; *see also Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60-62 (2004) (explaining the hierarchical scheme used by Congress to subdivide statutory sections).  And paragraph (9) does not address in any manner an

---

acknowledges deferred-action policies represent a valid extension of the federal power over immigration and an agency's discretion to use scarce enforcement resources in an effective manner.  *See Arizona*, 567 U.S. at 394; Deferred Action Op., 38 Op. O.L.C. at 13, 20.

alien's eligibility for state and local public benefits, providing only that aliens who have previously been removed from the United States, after defined periods of unlawful presence, are ineligible to gain reentry for a certain period. 8 U.S.C. § 1182(a)(9); *see also Estrada v. Becker*, 1:16-CV-3310-TWT, 2017 WL 2062078, at *6 (N.D. Ga. May 15, 2017) (holding the "temporary reprieve from prosecution" afforded DACA recipients "does not change a recipient's status and make them eligible for otherwise unavailable benefits") (citing *Texas v. United States*, 809 F.3d 134, 167 (5th Cir. 2015), and *Ga. Latino All. for Human Rights v. Governor*, 691 F.3d 1250, 1258 n.2 (11th Cir. 2012)). The definition contained within 8 U.S.C. § 1182(a)(9)(B)(ii) was proffered for a narrowly defined immigration purpose and does not render a DACA recipient lawfully present for all purposes that might arise throughout the entirety of the immigration statutes,[8] particularly where a meaningful and consistent definition is clear when the relevant provisions are read as a whole.

¶28 Moreover, to apply a blanket definition to the phrase "lawfully present" in disparate sections of a body of law as complex and extensive as immigration law would give "unintended breadth to the Acts of Congress." *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (applying "the principle of *noscitur a sociis* — a word is known by the company it keeps — to 'avoid ascribing to one word a meaning so broad that it is

---

[8] Appellees also rely on a Ninth Circuit Court of Appeals decision, which considered the definition of "lawfully present" found in 8 U.S.C. § 1182(a)(9), to support their position. *See Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 974 (9th Cir. 2017). This case is not persuasive, however, because the Ninth Circuit was interpreting the definition of a different phrase — "authorized presence" — and in a different context — to determine an alien's eligibility to apply for a driver's license. *Id.* at 963. Furthermore, the Ninth Circuit did not adopt the definition contained within 8 U.S.C. § 1182(a)(9)(B)(ii), but referenced the statute only to illustrate how the state's position was inconsistent with the federal immigration classification scheme, and thereby preempted. *See id.* at 974-75. In the present case, the AAG "did not create a novel immigration classification," but "[r]ather, . . . permissibly borrowed from existing federal classifications" in an attempt to distinguish those aliens who have attained a more concrete legal status — and are therefore eligible to receive state and local public benefits — from those who have not. *Id.* at 975 (quoting *LeClerc v. Webb*, 419 F.3d 405, 410 (5th Cir. 2005)); *see infra* Part II(B)(3). Moreover, the evidence presented indicated there was no basis to believe that DACA recipients' ability to obtain driver's licenses would otherwise facilitate their access to public benefits to which they were not entitled. *Id.* at 969.

inconsistent with its accompanying words'") (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995), and citing *United States v. Williams*, 553 U.S. 285, 294 (2008)). This is particularly true where Congress has expressly granted the states authority to determine alien eligibility for state and local public benefits. Congress would not simultaneously delegate this policy decision to an agency, such as DHS, where it would guarantee unremitting conflict between the two. *See Brown & Williamson*, 529 U.S. at 133 ("[W]e must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.") (citing *Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994)); *see also Estrada*, 2017 WL 2062078 at *5 (citing *Texas*, 809 F.3d at 183).

**¶29**      Furthermore, two of the most recent Congressional acts designed to repeal IIRIRA and institute a pathway to legal permanent resident status for certain unauthorized student-aliens have failed to pass. *See* Andorra Bruno, Cong. Research Serv., RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation* 5-8 (2012); Stephen L. Nelson, Jennifer L. Robinson & Anna M. Bergevin, *Administrative DREAM Acts and Piecemeal Policymaking: Examining State Higher Education Governing Board Policies Regarding In-State Tuition for Undocumented Immigrant Students*, 28 Geo. Immigr. L.J. 555, 566-68 (2014). This provides further evidence of a lack of Congressional intent to extend postsecondary education benefits beyond those defined as qualified aliens within 8 U.S.C. §§ 1621(a) and 1641(b)-(c). *See Texas*, 809 F.3d at 185 (citation omitted).

> 3.      DHS Has Avoided Defining "Lawfully Present" for the Purpose of Determining Eligibility for State and Local Public Benefits.

**¶30**      Congress has directly addressed the issue of alien eligibility for state and local public benefits, and DHS has not encroached upon that Congressional intent through its enunciation of the DACA policy. Congress charged DHS, at the time of its creation, with the administration and enforcement of all laws relating to the immigration and naturalization of aliens. 8 U.S.C. § 1103(a)(1). Within that enforcement authority, DHS has near-absolute prosecutorial discretion to enforce immigration law, because it is unable to "act against each technical violation" and must be free to prioritize the policy goals upon which the agency will spend its limited resources. *See Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (creating a general presumption of unreviewability of an agency's refusal to take enforcement action) (citations omitted). Indeed, "[a] principal feature of the

removal system" is DHS's broad discretion with regard to admissibility and removal procedures set forth by Congress. *Arizona*, 567 U.S. at 394.

¶31 DHS is not free, however, "to disregard legislative direction in the statutory scheme that the agency administers." *Heckler*, 470 U.S. at 833. Congress has granted DHS some discretion to define which aliens may physically remain within the country, but, of those aliens authorized to stay, Congress has exclusively and particularly delineated which of them may receive specific public benefits.[9] And Congress, not DHS, retains the right to define the path to citizenship and other recognized forms of immigration status. *See Brewer*, 855 F.3d at 971; *see also infra* ¶¶ 54-55. In the context of deferred-action policies, DHS has recognized this limitation for over a decade. *See* Memorandum from Doris Meissner, Comm'r, INS at 3 (Nov. 17, 2000) ("Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable

---

[9] The Students argue that deferred-action recipients' eligibility to receive specific federal public benefits is evidence that Congress intended DACA recipients to be eligible for state and local public benefits. Although non-qualified aliens are generally ineligible for federal public benefits, 8 U.S.C. § 1611(a), Congress created an exception for "an alien who is lawfully present in the United States *as determined by the [Secretary of DHS]*" to receive Social Security benefits, 8 U.S.C. § 1611(b)(2) (emphasis added). Because Congress attached additional qualifying language to the phrase "lawfully present" in discussing Social Security monies, we presume it intended a different meaning than the unqualified phrase used in 8 U.S.C. §§ 1621(d) and 1623(a). *See DePierre v. United States*, 564 U.S. 70, 83 (2011) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)). Moreover, the federal regulation interpreting 8 U.S.C. § 1611(b)(2) includes "[a]liens currently in deferred action status" as "lawfully present" for purposes of receiving Social Security benefits, but defines them separately from those "qualified alien[s] as defined in 8 U.S.C. [§] 1641(b)," thereby unequivocally limiting those aliens' eligibility solely to federal Social Security benefits. *See* 8 C.F.R. § 1.3(a)(1), (4)(vi). And, although DACA recipients may be eligible for Social Security benefits, they are specifically precluded from receiving federal postsecondary education assistance under 8 U.S.C. § 1611 and 20 U.S.C. § 1091(a)(5). *See also Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1032-33 (9th Cir. 2013). These statutes further undermine the Students' suggestion that Congress generally intended non-qualified aliens to be eligible for education benefits.

law that provides requirements for determining when the approval should be given."); Napolitano Memo at 3 (noting an exercise of prosecutorial discretion "confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights."); Deferred Action Op., 38 Op. O.L.C. at 2; USCIS Manual ch. 40.9.2(b)(3)(J) ("Deferred action is, in no way, an entitlement, and does not make the alien's status lawful.").

¶32        DHS has similarly acknowledged its limited ability to deem an alien "lawfully present" for specific immigration purposes. DHS may exercise its discretion to forego removal of a DACA recipient, but the effect is only to suspend the alien's unlawful presence for purposes of future admissibility. *See* Deferred Action Op., 38 Op. O.L.C. at 2; *see also Estrada*, 2017 WL 2062078 at *6. USCIS distinguishes between "unlawful status" and "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B), advising:

> [T]here are situations in which an alien who is present in an unlawful status nevertheless does not accrue unlawful presence. As a matter of prosecutorial discretion, DHS may permit an alien who is present in the United States unlawfully, but who has pending an application that stops the accrual of unlawful presence, to remain in the United States while that application is pending. In this sense, the alien's remaining can be said to be "authorized." *However, the fact that the alien does not accrue unlawful presence does not mean that the alien's presence in the United States is actually lawful*.

USCIS Manual ch. 40.9.2(a)(2) (emphasis added).

¶33        Indeed, it would be incongruous to communicate to DACA recipients that they are permitted to remain in the country and later penalize them for that same period of residency if they attempted to admit themselves lawfully. DHS would similarly not be able to effectively exercise its prosecutorial discretion had Congress not also authorized it to grant work authorization via EADs; otherwise, aliens granted deferred action as low enforcement priorities would be forced to support themselves through illegal means, thereby defeating the reason DHS chose to exercise its prosecutorial discretion in the first place.

¶34        Still, there is a fundamental distinction between basic benefits — such as the abilities to work, drive, or attend public school — afforded to those physically present in the United States for the sake of social order, and those secondary benefits commensurate with the assistance afforded

citizens, legal permanent residents, or certain alien-victims of acute humanitarian concerns. PRWORA itself makes this distinction, prohibiting states from restricting *any* alien's access to public benefits related to emergency and medical assistance. 8 U.S.C. § 1621(b). The ability to obtain financial assistance for postsecondary education, however, is not synonymous with emergency assistance; nor does access to postsecondary education impose an obligation upon taxpayers to offset the cost. *See Mathews v. Diaz*, 426 U.S. 67, 78-79 (1976); *see also Plyler v. Doe*, 457 U.S. 202, 221-22 (1982).[10]

**¶35**　　　In sum, Congress has specified those aliens who are "lawfully present" such that they are eligible to receive in-state tuition and other state and local public benefits. These "qualified aliens" include some deferred action and other discretionary relief recipients whom Congress has statutorily authorized based upon acute humanitarian concerns. DACA recipients are not defined as "qualified aliens." To effectively exercise its prosecutorial discretion, DHS is authorized to deem classes of aliens "lawfully present" for specifically articulated purposes, such as admissibility and work authorization, that do not include eligibility for state and local public benefits, with determinations as to those benefits being left to the individual states. Accordingly, we conclude that DACA recipients are not automatically eligible for in-state tuition benefits, but rather must look to Arizona's statutory provisions regarding alien eligibility for in-state tuition benefits.

## III.　　Preemption and Equal Protection

**¶36**　　　The Students argue the AAG's refusal to treat DACA recipients as "lawfully present" for in-state tuition either violates equal protection or is preempted. We review statutory and constitutional issues *de novo*. *Pedersen v. Bennett*, 230 Ariz. 556, 558, ¶ 6 (2012) (citing *Ross v. Bennett*, 228 Ariz. 174, 176, ¶ 6 (2011)).

---

[10]　　　In discussing minor children and basic education, *Plyler* afforded every alien equal protection to access public primary and secondary schools. 457 U.S. at 230; *see also* 8 U.S.C. § 1643(a)(2). Similar unfettered access to postsecondary education, however, has not been conferred constitutional protection. In fact, several states prohibit unauthorized aliens from receiving higher education. *See, e.g.,* Ala. Code § 31-13-8; S.C. Code Ann. § 59-101-430; *see also Estrada*, 2017 WL 2062078 at *1.

A.     Preemption of A.R.S. §§ 15-1803 & -1825

¶37     The Students argue Arizona's statutes codifying Prop 300 are preempted by federal law.  But in fact, Congress has expressly declined to preempt states' regulation of alien eligibility for state and local public benefits.  *See* 8 U.S.C. §§ 1621(d), 1622; *Martinez*, 241 P.3d at 867.  We thus consider whether IIRIRA's "[l]imitation on eligibility for preferential treatment of aliens not lawfully present on [the] basis of residence for higher education benefits," 8 U.S.C. § 1623, preempts Arizona's statutes.[11]

¶38     Juxtaposed against their federal counterparts, the Arizona statutes relevant in this case — A.R.S. §§ 15-1803 and -1825 — can only be preempted if they provide aliens who are "not lawfully present" — those who are non-qualified — with residence-based, postsecondary education benefits.  The only two questions that remain, therefore, are: (1) whether Arizona law, pursuant to PRWORA, intended to provide postsecondary education benefits to aliens who are not Congressionally defined as qualified or "lawfully present"; and, if so, (2) whether Arizona law, pursuant to IIRIRA, avoids providing such aliens with residence-based, in-state tuition.

¶39     Because A.R.S. §§ 15-1803 and -1825 both derive from Prop 300, our primary purpose in statutory interpretation is to effectuate the intent of the state's electorate that adopted it.  *Calik v. Kongable*, 195 Ariz. 496, 498, ¶ 10 (1999) (quoting *Jett v. City of Tucson*, 180 Ariz. 115, 119 (1994)).  "The best indicator of that intent is the statute's plain language, and, if that language is clear and unambiguous, we apply it as written."  *State v. Liwski*,

---

[11]     Other states have generally construed IIRIRA as preempting state laws that grant in-state tuition rates to unlawfully present or non-qualified aliens solely upon the basis of residence.  *See Martinez*, 241 P.3d at 863-64.  In the context of in-state tuition benefits, residence is most often defined as physical presence and an intention to remain, analogous to domicile.  *See Martinez v. Bynum*, 461 U.S. 321, 330-31 (1983); *Webster v. Ariz. Bd. of Regents*, 123 Ariz. 363, 365 (App. 1979) (declaring students seeking to prove domicile must show, by clear and convincing evidence, physical presence and intent to remain permanently).  *But see* 8 U.S.C. §§ 1101(a)(33), 1641(a) (defining "residence" for purposes of PRWORA and IIRIRA as a person's "place of general abode" or "his principal, actual dwelling place in fact, without regard to intent").  To avoid preemption, some state laws permit non-qualified aliens to receive in-state tuition on the basis of high school attendance and graduation.  *See, e.g.*, Cal. Educ. Code § 68130.5(a); Colo. Rev. Stat. § 23-7-110; N.M. Stat. § 21-1-4.6(B).

238 Ariz. 184, 186, ¶ 5 (App. 2015) (citing *State v. Matlock*, 237 Ariz. 331, 334, ¶ 10 (App. 2015)). If ambiguity exists, however, "we attempt to determine legislative intent . . . consider[ing] 'the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose.'" *Calik*, 195 Ariz. at 500, ¶ 16 (quoting *Aros v. Beneficial Ariz., Inc.*, 194 Ariz. 62, 66 (1999)). Furthermore, the publicity pamphlet for, and stated purpose of, an initiative such as Prop 300 are indicative of legislative intent. *Id.*

¶40         Together, A.R.S. §§ 15-1803 and -1825 describe four groups that are eligible to receive in-state tuition: (1) citizens; (2) "legal resident[s]"; (3) those with "lawful immigration status"; and (4) those "lawfully present." The trial court correctly noted the two statutes "use the four terms interchangeably and without meaningful difference," although it is clear these terms were to be construed "in accordance with" federal law, specifically IIRIRA. *See* A.R.S. § 15-1803(B). As we have stated, IIRIRA prohibits states from offering residence-based, in-state tuition benefits to aliens who are "not lawfully present," which, in the context of a state or local public benefit such as in-state tuition, are those aliens deemed non-qualified under federal law. We must now determine whether Arizona intended to mirror the federal definition of qualified aliens.

¶41         No language in either statute evidences an intent to stray from the provisions of PRWORA or IIRIRA regarding alien eligibility for in-state tuition or other state and local public benefits. Furthermore, the legislative history of Prop 300 is consistent with our interpretation. The bill's sponsor specifically stated "[i]t [wa]s not any change in federal law," *see* H. Comm. on K-12 Educ., 47th Leg., 2nd Reg. Sess., at 13 (Ariz. Mar. 29, 2006) (statement of Sen. Dean Martin), and another proponent declared the "resolution does not change the [federal] law, but enforces eligibility standards already in the law," *see* H. Comm. on Appropriations (P), 47th Leg., 2nd Reg. Sess., at 15 (Ariz. Mar. 29, 2006) (statement of Chairman Russell Pearce).

¶42         In considering the plausible interpretations of a statute, we must be mindful of "the effect of different interpretations," *Bell v. Indus. Comm'n*, 236 Ariz. 478, 480, ¶ 7 (2015) (citing *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 383, ¶ 8 (2013)), and "[i]t is our duty to uphold statutes, if their language will permit, even though the statute may not be artfully drawn," *State v. Book-Cellar, Inc.*, 139 Ariz. 525, 528 (App. 1984) (quoting *State v. Grijalva*, 111 Ariz. 476, 478 (1975)). Because A.R.S. § 15-1803(B) incorporates the residency or domiciliary requirements of A.R.S.

§§ 15-1802 and -1802.01,[12] *see Webster*, 123 Ariz. at 365 (citation omitted), the statute would be preempted by IIRIRA if it extended in-state tuition to aliens who are non-qualified under 8 U.S.C. §§ 1621(a) and 1641(b)-(c). Thus, we conclude Arizona's scheme incorporates the qualified alien distinction drawn by PRWORA and IIRIRA, and is therefore consistent with, and not preempted by, federal law.

### B. Equal Protection

**¶43** The Students also assert the AAG has singled out DACA recipients for disparate treatment, as compared to other deferred-action recipients, in violation of the equal protection clause of the U.S. Constitution. *See* U.S. Const. amend. XIV, § 1. Had the AAG done so, its classifications would likely be heavily scrutinized and overturned. *See, e.g., Graham v. Richardson*, 403 U.S. 365, 371-72 (1971) (noting "[state] classifications based on alienage . . . are inherently suspect and subject to close judicial scrutiny" and holding provisions of state welfare laws conditioning benefits upon citizenship were violative of equal protection). But the AAG has not classified aliens for the purpose of receipt of state and local public benefits; Congress did, through its plenary power to do so. *See Mathews*, 426 U.S. at 78-80. Because unauthorized aliens are not a suspect class and education is not a fundamental right, *Plyler*, 457 U.S. at 223-24, Congressional classification of aliens is subject to rational basis review, *Mathews*, 426 U.S. at 82-83.

**¶44** In addressing whether a rational basis exists for the challenged classifications, the legislation is "accorded a strong presumption of validity," and the burden is upon the party challenging the legislation to show the absence of "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319-20 (1993) (quotations and citations omitted). And the U.S. Supreme Court has already determined "Congress has no constitutional duty to provide [a]ll aliens with the welfare benefits provided to citizens . . . . [I]t is unquestionably reasonable for Congress to make an alien's eligibility depend on both the character and the duration of his residence [because] neither requirement is wholly irrational." *Mathews*, 426 U.S. at 82-83.

---

[12] Indeed, as the Concurrence adroitly points out, early drafts of Prop 300 that based eligibility for in-state tuition benefits on other factors, such as high school attendance and parental tax filings, were rejected. *See infra* ¶ 62.

¶**45** Congress has clearly defined what constitutes "lawful presence" for purposes of receiving state and local public benefits, and DACA recipients are not qualified aliens for this purpose. Although the DACA policy protects its recipients from accruing unlawful presence for the purpose of determining future admissibility and permits the issuance of EADs so recipients may lawfully sustain themselves while in this country, these benefits do not translate into the recipients' eligibility for in-state tuition or other state and local public benefits. This legislative distinction is ostensibly borne of acute humanitarian concern for certain classes of unauthorized aliens, of which DACA recipients are not included. As stated in Part III(A), Arizona law is consistent with Congressional classifications of aliens eligible for state and local public benefits. The Students have therefore not met their burden of proving the AAG subjected DACA recipients to disparate treatment by doing nothing more than accepting those federal classifications.[13]

## CONCLUSION

¶**46** Congress has not defined DACA recipients as "lawfully present" for purposes of eligibility for in-state tuition or other state or local public benefits. Congress has, conversely, authorized each state to determine whether aliens, otherwise non-qualified under federal law, should be granted state or local public benefits. Arizona's statutory scheme for postsecondary education benefits does not demonstrate an intent to create that eligibility for DACA recipients. Although DACA recipients are

---

[13] To the extent the Students argue the AAG treats those with EADs disparately under A.R.S. § 1-502, we are unconvinced. First, A.R.S. §§ 1-501(A) and -502(A) "specifically authorize agencies to accept an Arizona driver license or nonoperating identification license as acceptable proof of lawful presence." Op. Ariz. Att'y Gen. I10-008, at 16. Although "[t]his identification may establish lawful presence, . . . it does not establish whether a person is a qualified alien, nonimmigrant, or an alien who is paroled into the United States[,] . . . which are the eligibility requirements in 8 U.S.C. § 1621," *id.*, and, as set forth in Part II, *supra*, form the prerequisite for eligibility for postsecondary education benefits. Section 1-502 was merely enacted to respond to PRWORA. *See* 8 U.S.C. § 1625 (authorizing each state "to require an applicant for State and local public benefits (as defined in section 1621(c) of this title) to provide proof of eligibility"). Second, because the AAG is accurately enforcing federal legislation governing alien eligibility for state and local public benefits, there is no equal protection violation.

"lawfully present" for the specific purpose of obtaining EADs, these documents do not automatically confer eligibility for in-state tuition. Considered together, federal and state law therefore prohibit MCCCD from granting in-state tuition benefits to DACA recipients. As a result, MCCCD may be enjoined from offering in-state tuition to DACA recipients. Accordingly, we reverse the trial court's orders granting Appellees' motions for summary judgment and remand with instructions to enter a judgment enjoining MCCCD from granting in-state tuition to DACA recipients.

¶47            MCCCD and the Students request attorneys' fees and costs on appeal pursuant to A.R.S. §§ 12-341 and -348.01. Because they were not successful, we deny the requests. However, as the prevailing party, the AAG is entitled to its costs incurred on appeal upon compliance with ARCAP 21(b).[14]

N O R R I S, Judge, specially concurring:

¶48            The first pivotal issue in this appeal is whether the AAG had standing to sue MCCCD for the declaratory and injunctive relief it requested. *See supra* ¶ 7. I agree with the majority the AAG had standing to pursue the requested declaratory and injunctive relief against MCCCD. Thus, I concur in the majority's decision at ¶¶ 7-11.

¶49            The second pivotal issue in this appeal is whether MCCCD may offer in-state tuition to DACA recipients who otherwise meet admission requirements. Following the AAG's lead, the majority resolves this issue by principally focusing on two federal statutes, 8 U.S.C. § 1621, enacted as part of the Personal Responsibility and Work Opportunity Reconciliation Act, and 8 U.S.C. § 1623, enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act. Subject to specified exceptions not relevant here, *see* 8 U.S.C. § 1621(b), 8 U.S.C. § 1621(a) prohibits aliens who do not meet certain requirements from being eligible for a variety of state or local public benefits, defined to arguably

---

[14]       The AAG did not request its attorneys' fees incurred on appeal. In its complaint, the AAG requested a fee award under A.R.S. § 12-348.01. On remand, the trial court may consider the AAG's request for fees under this statute but only for its work in the trial court. We express no opinion on whether the trial court should award the AAG fees under this statute.

include postsecondary education benefits.[15]  Section 1621(d), however, allows a state to grant these benefits to an alien "not lawfully present in the United States" if it affirmatively provides for such eligibility through a state law enacted after August 22, 1996. Section 1623(a) goes one step further, and directly addresses when a state may provide a "postsecondary education benefit" to "an alien not lawfully present in the United States." *See infra* ¶ 56.

¶50        In my view, whether MCCCD may offer in-state tuition to DACA recipients who otherwise meet admission requirements is not controlled by either 8 U.S.C. § 1621(a) or 8 U.S.C. § 1623(a), but instead by two Arizona statutes, A.R.S. § 15-1803(B) and A.R.S. § 15-1825(A), enacted by the voters as part of Proposition 300.  Under these statutes, DACA recipients are not eligible for in-state tuition.  Accordingly, although I agree with the majority that MCCCD was not entitled to offer DACA recipients in-state tuition, I do not join in the majority's reasoning.

¶51        The third pivotal issue in this appeal is whether the AAG singled out DACA recipients for disparate treatment, as compared to other deferred action recipients, in violation of the Equal Protection Clause of the United States Constitution and federal preemption principles.  Although I also agree with the majority's rejection of the Students' equal protection and federal preemption arguments, I do so based solely on the record before us.  Accordingly, I agree with the result reached, but not the reasoning of, the majority on the equal protection and preemption issues.

---

[15]        Section 1621(c)(1)(b) broadly defines "state or local public benefit" as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual . . . by an agency of a State or local government or by appropriated funds of a State or local government."  Not all courts agree that in-state tuition constitutes a postsecondary education benefit under this definition. *Compare Martinez v. The Regents of the Univ. of Cal.*, 241 P.3d 855, 866-69 (2010) (implicitly recognizing that California statute exempting "unlawful aliens" from paying nonresident tuition at California state colleges and universities under certain circumstances provides a postsecondary education benefit under 8 U.S.C. § 1621(c)(1)(b), *with Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 605 (E.D. Va. 2004) (Personal Responsibility and Work Opportunity Reconciliation Act addresses only postsecondary monetary assistance paid to students or their households, not admission to college or university).

## A. Proposition 300, A.R.S. § 15-1803(B), A.R.S. § 15-1825(A), and DACA

¶52    In 2006, the voters approved Proposition 300.   That proposition amended state statutes that governed in-state tuition and financial assistance to individuals enrolled in a publicly funded state university or community college. As approved by the voters, A.R.S. § 15-1803(B) bars a person who is "without lawful immigration status" from being classified as an in-state student at publicly funded state university and community colleges.  That section reads as follows:

> In accordance with the illegal immigration reform and immigrant responsibility act of 1996 (P.L. 104-208; 110 Stat. 3009), a person who was not a citizen or legal resident of the United States or who is without lawful immigration status is not entitled to classification as an in-state student pursuant to § 15-1802 or entitled to classification as a county resident pursuant to § 15-1802.01.

A.R.S. § 15-1803(B).

¶53    Similarly, as approved by the voters, A.R.S. § 15-1825(A) bars a student at a publicly funded state university or community college "without lawful immigration status" from receiving a tuition waiver, fee waiver, tuition assistance, or any other type of financial assistance subsidized or paid in whole or in part with state monies.  That section reads as follows:

> A person who is not a citizen of the United States, who is without lawful immigration status and who is enrolled as a student at any university under the jurisdiction of the Arizona board of regents or at any community college under the jurisdiction of a community college district in this state is not entitled to tuition waivers, fee waivers, grants, scholarship assistance, financial aid, tuition assistance or any other type of financial assistance that is subsidized or paid in whole or in part with state monies.

A.R.S. § 15-1825(A).

¶54    Although the two statutes do not define "lawful immigration status," neither MCCCD nor the Students have argued the DACA program confers lawful immigration status, that is, an enforceable legal right, to remain in the United States on DACA recipients.  Nor, as a matter of law,

could they make that argument. Like other deferred action programs, the DACA program is based on the exercise of administrative discretion by immigration officials to defer the removal of a person unlawfully present in the United States. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 n.8, 119 S. Ct. 936, 943-44 n.8, 142 L. Ed. 2d 940 (1999); *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1058 (9th Cir. 2014) ("Like recipients of other forms of deferred action, DACA recipients enjoy no formal immigration status."). Although deferred action programs, like the DACA program, are an established feature of the Unites States immigration removal system, acknowledged by the Supreme Court and Congress, *Reno*, 525 U.S. at 484-85, 119 S. Ct. at 944-45; *see, e.g.*, 8 U.S.C. § 1154 (a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), as the Secretary of the Department of Homeland Security ("DHS") explained in her memorandum announcing the DACA program, the program "confers no substantive right, immigration status or pathway to citizenship" and "[o]nly the Congress, acting through its legislative authority, can confer these rights," *see supra* ¶ 31.

¶55 Although the DACA program does not confer lawful immigration status, that is, an enforceable legal right to remain in the United States, on DACA recipients, DHS considers DACA recipients, like other deferred action recipients, "not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General." *Ariz. Dream Act Coalition*, 757 F.3d at 1059 (citing authority); *see also Ga. Latino All. for Human Rights v. Governor*, 691 F.3d 1250, 1258-59 (11th Cir. 2012) (deferred action recipient remains "permissibly" in the United States). And, pursuant to DHS regulations, deferred action recipients are authorized to, and indeed must, apply to the Unites States Citizenship and Immigration Services for an "employment authorization document," known as an "EAD," to work in the United States. 8 C.F.R. § 274a.12(c)(14).

¶56 Because deferred action programs are well-established under federal immigration law and DHS considers deferred action recipients lawfully present in the United States, MCCCD and the Students successfully argued in the superior court that DACA recipients are eligible for in-state tuition because A.R.S. § 15-1803(B) specifies it is to be construed "in accordance" with 8 U.S.C. § 1623(a), which they argue, links or ties eligibility for in-state tuition to a person's lawful presence in the United States. Section 8 U.S.C. § 1623(a) reads as follows:

> Notwithstanding any other provision of law, an alien who is
> not lawfully present in the United States shall not be eligible

on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

¶57        Although MCCCD and the Students have not explicitly argued A.R.S. § 15-1803(B) incorporates by reference 8 U.S.C. § 1623(a), that is the thrust of their argument. To quote MCCCD's brief on appeal: "[T]he Arizona statute expressly references the federal statute, indicating the intention to interpret one the same way as the other . . . . For that express statutory cross-reference [in A.R.S. § 15-1803(B)] to make any sense, the phrase 'lawful immigration status' in A.R.S. § 15-1803(B) must mean the same thing as 'lawfully present' in 8 U.S.C. § 1623[a]." Based solely on the language of U.S.C. § 1623(a) and A.R.S. § 15-1803(B), I reject that argument. *See generally State v. Thomas*, 219 Ariz. 127, 129, ¶ 6, 194 P.3d 394, 396 (2008) (when resolving questions of statutory interpretation, court should first consider the language of the statute as it provides the best and most reliable index of the statute's meaning) (citations omitted).

¶58        On its face, 8 U.S.C. § 1623(a) does not define "lawfully present." Nevertheless, even if, as MCCCD and the Students argue, 8 U.S.C. § 1623's reference to "lawfully present" includes a person present in the United States under a deferred action program, the statute does not compel a state to do anything or, of importance here, grant a person lawfully present in the United States any postsecondary education benefit, such as in-state tuition. Instead, the statute allows a state to grant any postsecondary education benefit, which would include in-state tuition, to an "alien who is not lawfully present in the United States" based on the alien's residence within the state if it grants the same benefit to any United States citizen or national, regardless of that person's residence. Thus, 8 U.S.C. § 1623(a) provides a state with a choice: if a state wants to make aliens who are not lawfully present in the United States eligible for in-state tuition based on residence within the state, then the state must make in-state tuition available to United States citizens or nationals, regardless of their residence.

¶59        Because 8 U.S.C. § 1623(a) simply allows a state to decide whether to grant in-state tuition to an alien not lawfully present in the United States, A.R.S. § 15-1803(B)'s reference to 8 U.S.C. § 1623(a) amounts to nothing more than an acknowledgement that the federal statute authorizes Arizona to make this decision. In other words, the phrase "[i]n accordance with" simply means "as authorized by" or "pursuant to." The

reference does not place a definitional gloss on or modify the meaning of "without lawful immigration status" as used in A.R.S. § 15-1803(B), as MCCCD and the Students essentially argue.

¶60 Further, even if there was some ambiguity regarding the meaning of the "in accordance with" reference to 8 U.S.C. § 1623(a) contained in A.R.S. § 15-1803(B), the legislative history surrounding Proposition 300 demonstrates that neither the Legislature that referred Proposition 300 to the voters nor the voters who approved Proposition 300 intended the "in accordance with" reference to give the phrase "lawful immigration status" the same meaning as "lawful presence." The history of what became Proposition 300 and the situation it was designed to address make this crystal clear. *See Simpson v. Owens*, 207 Ariz. 261, 265, ¶ 12, 85 P.3d 478, 482 (App. 2004) (court must effectuate the intent of those who framed the proposition, and in the case of a referendum, the intent of the electorate that adopted it; if the meaning is not clear, the court will consider the history and purpose of the proposition).

¶61 What became Proposition 300 started out in the Forty-Seventh Legislature (First Regular Session 2005) as House Bill 2030 ("HB 2030"). As passed by the Legislature, HB 2030 was, in all respects, identical to Proposition 300. Then-Governor Janet Napolitano vetoed HB 2030. In her May 20, 2005 veto letter, Governor Napolitano explained she believed Arizona laws should not "discourage" high school graduates who had been brought into the United States illegally "as small children by their parents" from contributing to the United States.

¶62 Responding to Governor Napolitano's veto of HB 2030, the Legislature in the next legislative session (Forty-Seventh Legislature, Second Regular Session 2006) passed Senate Concurrent Resolution 1031 ("SCR 1031"), and referred SCR 1031, which was identical to HB 2030, to the voters. Before the Legislature gave final approval to SCR 1031, the House of Representatives rejected a Senate amendment to SCR 1031 that would have allowed a person *without* lawful immigration status to be classified as an in-state student for tuition purposes if that person met certain residency and income tax requirements.[16] The Legislature's rejection of this proposed amendment demonstrates that in drafting and

---

[16] These conditions required the person to have attended a state public school for at least six years, to have graduated from a state public high school, and to have a parent who had filed an income tax return in Arizona for the six taxable years preceding the person's enrollment in a state university or community college.

referring SCR 1031 to the voters, it deliberately excluded students who did not have lawful immigration status from receiving postsecondary education benefits, including in-state tuition.

¶63          Arguments in favor of Proposition 300 contained in the Secretary of State's publicity pamphlet for the 2006 general election further demonstrate Proposition 300 was intended to prevent those without lawful immigration status from having access to in-state tuition or to state subsidized financial assistance. The "for" arguments emphasized that "citizens of foreign countries, who break the law to enter Arizona illegally, are given taxpayer subsidized tuition," Ariz. Sec'y of State, 2006 Publicity Pamphlet 103 (2006), and, even more tellingly, "Last year . . . Governor Napolitano . . . VETOED it (HB 2030). Now you have a chance to override the Governor's veto. We have many needs in Arizona; if we end taxpayer subsidies for illegals, we will save millions of tax dollars that could benefit US citizens." *Id.*

¶64          The proponents of Proposition 300 were not alone in recognizing that Proposition 300 was intended to prevent those without lawful immigration status from receiving in-state tuition and state subsidized financial assistance. An opponent of Proposition 300 wrote in the publicity pamphlet that Proposition 300 would "prohibit colleges and community colleges from giving resident status, scholarship assistance, and the like to [students not here legally], fly in the face of our state's need for an educated workforce to attract new jobs and lay the foundation of our economic future." *Id.* at 104. Similarly, another opponent of Proposition 300 wrote:

> [S]ome immigrant parents bring their children to the U.S. and the children are here without legal documents . . . . The mean spirited proponents of Proposition 300 want to end the ability of these children to progress in Arizona's public higher education system. Proposition 300 will prohibit the granting of in-state resident tuition status to any such person at a Community College or University. A Senate compromise allowing undocumented children to be granted in-state tuition status if the student had been in Arizona for at least six years and if the parents had filed income taxes for those six years was removed in the House.

*Id.*

**¶65**        Given the wording of A.R.S. § 15-1803(A) and A.R.S. § 15-1825(A), the evolutionary history of Proposition 300, and the "for" and "against" arguments in the publicity pamphlet, the voters were explicitly informed Proposition 300 would bar students without lawful immigration status from receiving in-state tuition and financial assistance subsidized with state monies.  To argue otherwise, as MCCCD and the Students have, ignores this reality.

**¶66**        MCCCD and the students also argue "lawful immigration status" in A.R.S. § 15-1803(B) must mean "lawfully present" because Proposition 300 used those two phrases interchangeably.  For example, MCCCD and the Students point out A.R.S. § 15-1825(A) bars a person "without lawful immigration status" enrolled as a student at any state university or community college from receiving financial assistance subsidized or paid in whole or in part with state monies, while A.R.S. § 15-1825(B) requires community colleges and universities to report the number of students "not entitled" to such assistance because they are "not lawfully present in the United States."  Thus, MCCCD and the Students argue the "reporting obligation in subsection B must cover the same scope as the prohibition in subsection A for the statute to make any sense," and, therefore, "lawful immigration status" as used in Proposition 300 must mean the same thing as "lawfully present."  This argument is grounded on an interpretation of Proposition 300 that is at odds with what Proposition 300 was intended to do.  In my view, the reverse argument is true—Proposition 300 used the phrase "lawfully present" to refer to a person with, and only with, "lawful immigration status."

**¶67**        Finally, MCCCD and the Students argue that DACA recipients are entitled to in-state tuition because A.R.S. § 1-502(A)(7) allows a person to submit an EAD to an agency or political subdivision of the state to demonstrate his or her "lawful presence in the United States."  This argument ignores the meaning of "legal immigration status" in A.R.S. § 15-1803(B) and A.R.S. § 15-1825(A) as reflected in Proposition 300's legislative history.  Further, this argument ignores that A.R.S. § 1-502, enacted by the Legislature in 2009, three years after the voters approved Proposition 300, does nothing more than list various documents a person may use to show "lawful presence" in the United States.  The statute does not grant a person eligibility for any public benefit such as in-state tuition or state subsidized financial assistance to attend a state university or community college.

29

**¶68** For the foregoing reasons, I agree with the majority that under current state law, specifically, A.R.S. § 15-1803(B) and A.R.S. § 15-1825(A), DACA recipients are not eligible for in-state tuition. Accordingly, I do not need to address the AAG's argument that 8 U.S.C. § 1621(d) bars MCCCD from granting in-state tuition to DACA recipients because Arizona has not affirmatively authorized such a benefit.

## B. Equal Protection and Federal Preemption

**¶69** The Students have asserted the AAG singled out DACA recipients for disparate treatment, as compared to other deferred action recipients, in violation of the Equal Protection Clause of the United States Constitution. Given its ruling on the in-state tuition issue based on its construction of A.R.S. § 15-1803(B), the superior court denied the Students' claim as moot, although it did note the Students' claim appeared to have merit. On appeal, the AAG argues we should affirm the superior court's dismissal of the Students' equal protection claim because they failed to support that claim with any evidence of such disparate treatment.

**¶70** I agree with the AAG the Students did not support their equal protection claim with evidence. Therefore, on this record—and only on this record—I agree with the majority the Students failed to present a cognizable equal protection claim.

**¶71** The Students also asserted in the superior court that federal law preempted the AAG's alleged disparate treatment of DACA recipients because by attempting to prohibit DACA recipients, but not other deferred action recipients, from receiving in-state tuition, the AAG was treating DACA recipients as a sub-class of aliens even though DACA recipients, like other deferred action recipients, are lawfully present in the United States. Although the superior court did rule on this argument, the AAG asks us to "dismiss" this claim.

**¶72** As noted above, the Students presented no evidence of disparate treatment. Further, the Students' preemption argument is grounded on interpreting A.R.S. § 15-1803(B) as incorporating by reference 8 U.S.C. § 1623(a) and construing 8 U.S.C. § 1623(a) as requiring a state to confer postsecondary education benefits on individuals who are lawfully present in the United States—arguments I reject. Therefore, I agree with the majority that the Students failed to present a cognizable federal preemption claim.

¶73      I acknowledge the sincerity of the arguments of MCCCD and the Students, and the force of the policy reasons that caused Arizonans to speak out against Proposition 300.  Nevertheless, for the foregoing reasons, I agree with the majority that MCCCD was not authorized by state law to offer in-state tuition to DACA recipients.  As explained above, I also concur in ¶¶ 7-11 of the majority's decision, and join in the conclusions reached by, but not the reasoning of, the majority on the equal protection and preemption issues.



AMY M. WOOD • Clerk of the Court
FILED:  AA