**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 24, 2017**

# In the Court of Appeals of Georgia

A17A1124. ALFORD et al. v. HERNANDEZ et al.

REESE, Judge.

In this mandamus action, C. Dean Alford and other members of the University System of Georgia's Board of Regents (collectively, "Appellants") seek review of a superior court's grant of summary judgment to Rigoberto Rivera Hernandez and other undocumented immigrants (collectively "Appellees"). Each of the Appellees are Georgia residents who have been granted limited protection from deportation under the Deferred Action for Childhood Arrivals ("DACA") policy established by the United States Department of Homeland Security ("DHS") in 2012. The Appellees' petition for a writ of mandamus sought an order from the court compelling the Appellants to deem the Appellees eligible for "in-state tuition benefits" while the Appellees are enrolled in Georgia's public universities and colleges. On appeal from

the superior court's order, the Appellants contend that the court erred in granting summary judgment to the Appellees and in denying their motion to dismiss the petition, arguing that the court erred in finding that, under DACA, the Appellees were "lawfully present" in the country as a matter of law and, therefore, the Appellants were required to offer them in-state tuition. They also contend that the court incorrectly applied the standard for granting a writ of mandamus and that the court should have dismissed the Appellees' claims because they were barred by official immunity. For the reasons set forth, infra, we reverse the superior court's grant of summary judgment to the Appellees. We also reverse the court's denial of the Appellants' motion to dismiss.

Viewed in the light most favorable to the Appellants, as the party opposing the grant of summary judgment,[1] the record shows the following undisputed facts.

A. *The DACA Policy.*

In June 2012, the DHS Secretary issued a memorandum to various federal agencies tasked with enforcing the country's immigration laws, announcing the

---

[1] See *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

establishment of the DACA policy.[2] The memorandum explained that certain

undocumented immigrants who came to the United States before the age of 16 and

who met other specific requirements would be able to apply for deferred deportation

under DACA. If their applications were approved, they would receive limited

protection from deportation for a two-year period, subject to renewal if they

continued to meet DACA's requirements. According to the memorandum, the limited

protection from deportation provided by DACA was based upon the DHS's exercise

of prosecutorial discretion in prioritizing its use of immigration enforcement

resources,[3] explaining that the undocumented immigrants who met DACA's criteria

---

[2] We note that, on September 5, 2017, the Acting Secretary of the DHS issued a memorandum rescinding DACA and providing notice that the agency would reject any new DACA applications filed after that date. However, the DHS allowed current DACA recipients to remain in the program until their permits expired, as long as they met the required criteria, and allowed those recipients to apply for a two-year renewal of their permits, as long as they did so by October 5, 2017. It follows that, despite the announcement of the rescission of DACA, the Appellees could remain DACA recipients until at least October 2019. Consequently, the issues presented in this appeal are not moot. Cf. *Babies Right Start v. Ga. Dept. of Pub. Health*, 293 Ga. 553, 555 (2) (a) (748 SE2d 404) (2013) (After the plaintiff was disqualified from participating in a government program, it filed a petition for mandamus and injunctive relief. However, the period of disqualification had expired, so the plaintiff's claims were moot, because, even if the claims were granted, such relief would have no effect.).

[3] See generally *Arizona ex rel. Brnovich v. Maricopa County Community College Dist. Bd.*, 395 P3d 714, 724 (II) (B) (3) (Ariz. Ct. App. 2017) ("Congress

3

were "low priority cases" when compared to others who were subject to deportation. The memorandum emphasized that DACA conferred to the recipients "*no substantive right, immigration status or pathway to citizenship*," explaining that "[o]nly the Congress, acting through its legislative authority, can confer these rights."[4]

The DHS's Office of Citizenship and Immigration Services ("USCIS") subsequently published a Frequently Asked Questions ("FAQ") page on its website that provided a more detailed explanation of DACA, the application process, and related issues. According to the website, DACA offered recipients "[d]eferred action," which it defined as "a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion," adding that "DHS can terminate or renew deferred action at any time, at the agency's discretion." Further,

---

charged DHS, at the time of its creation, with the administration and enforcement of all laws relating to the immigration and naturalization of aliens. 8 USC § 1103 (a) (1). Within that enforcement authority, DHS has near-absolute prosecutorial discretion to enforce immigration law, because it is unable to act against each technical violation and must be free to prioritize the policy goals upon which the agency will spend its limited resources.") (citation and punctuation omitted).

[4] (Emphasis supplied.)

the website stated that the grant of deferred action could affect a future determination of whether a recipient had been "unlawfully present" in the United States.[5]

> For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous periods of unlawful presence.

The website notified DACA program participants that

> [t]he fact that you are not accruing unlawful presence does not change whether you are in lawful [immigration] status while you remain in the United States. However, . . . your period of stay is authorized by the [DHS] while your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time.

---

[5] See *Maricopa County Community College Dist. Bd.*, 395 P3d at 725 (II) (B) (3) ("DHS may exercise its discretion to forego removal of a DACA recipient, but the effect is only to suspend the alien's unlawful presence for purposes of future admissibility.") (citations omitted).

In addition, the website stated that, "[a]part from the immigration laws, 'unlawful presence,' 'lawful status' and similar terms are used in various other federal and state laws," and recommended that, "[f]or information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state or local authorities."

Finally, in October 2015, the Secretary of the United States Department of Education sent a "Key Policy Letter" to the leaders of colleges and universities to provide information about DACA. According to the Secretary, while federal law did not prohibit the admission of undocumented students to postsecondary educational institutions or require the institutions to determine a student's citizenship or immigration status, individual states might have laws or policies relevant to these issues. Similarly, while undocumented students were not eligible for federal student financial assistance, they might be eligible for state, institutional, and private student aid. The memorandum specifically stated that, while DACA recipients "*may* be eligible to receive in-State tuition under State law for their enrollment in public postsecondary educational institutions," that determination "*depends on State law and policies*."[6]

---

[6] (Emphasis supplied.)

B. *Procedural Background of the Instant Case.*

In April 2016, the Appellees filed a petition for a writ of mandamus, asserting that the Appellants[7] had improperly denied them "in-state tuition" status, even though they met the residency requirements set forth in the policy manual of the Board of Regents ("Board"). Specifically, the Appellees claimed that, as DACA recipients, the federal government considered them to be "lawfully present" in the United States and that the Appellants had failed to discharge their duty when they refused to accept this classification when determining whether the Appellees were eligible for in-state tuition. The Appellees asked the superior court to issue a writ of mandamus to compel the Appellants to comply with OCGA § 20-3-66 (d)[8] and Board Rules 4.3.4 and

---

[7] Although the complaint states that the Appellants were sued in "their individual capacities as members of the University System of Georgia's Board of Regents," the relief the Appellees seek cannot be afforded by the Board members individually. See *Southern LNG, Inc. v. MacGinnitie*, 294 Ga. 657, 661 (3) (a) (755 SE2d 683) (2014) ("Mandamus is a remedy for improper government inaction – the failure of a *public official* to perform a clear legal duty.") (citation omitted; emphasis supplied). Therefore, we construe this lawsuit as being brought against the members of the Board in their official capacities. See *Cosby v. Lewis*, 308 Ga. App. 668, 672 (1) (708 SE2d 585) (2011) ("[M]erely naming a defendant individually in a complaint is not conclusive as to the capacity in which that defendant is sued. Instead, the reason for the lawsuit is the determinative factor as to a defendant's capacity.") (punctuation and footnotes omitted).

[8] OCGA § 20-3-66 (d) provides:
Noncitizen students shall not be classified as in-state for tuition

7

7.3.1.1,[9] and to "fully and correctly implement" the Board's in-state tuition standards by finding that they were "lawfully present" and, thus, qualified for in-state tuition.

The Appellants filed a motion to dismiss, arguing several substantive grounds, including that a writ of mandamus would only lie when a public official had a "clear legal duty" to perform in a specific manner and that the DHS's statement that DACA recipients would be deemed "lawfully present" for federal immigration purposes did not create a clear legal duty requiring the Appellants to classify the Appellees as in-state residents for tuition purposes. The same day, the Appellees filed a motion for summary judgment, arguing that they had

---

purposes unless the student is legally in this state and there is evidence to warrant consideration of in-state classification as determined by the [B]oard of [R]egents. Lawful permanent residents, refugees, asylees, or other eligible noncitizens as defined by federal Title IV regulations may be extended the same consideration as citizens of the United States in determining whether they qualify for in-state classification.

[9] See Board Policy Manual Rules 4.3.4 ("Each University System institution shall verify the lawful presence in the United States of every successfully admitted person applying for resident tuition status, as defined in Section 7.3 of this Policy Manual[.]"); 7.3.1.1 ("In-State Tuition shall be defined as the rate paid by students who meet the residency status requirements as provided in Section 4.3 of this Policy Manual. . . . Out-of-State Tuition shall be defined as the rate paid by students who do not meet the residency status requirements as provided in Section 4.3 of this Policy Manual."); see also Board Policy Manual Rule 4.3.2.3 (adopting the language of OCGA § 20-3-66 (d)).

petitioned and been approved for [DACA], giving them "lawful presence" in the United States. The [Appellants] have continued to use an incorrect definition of federal law to bar [them] from paying in-state tuition, despite the federal government unequivocally stating that DACA beneficiaries do have "lawful presence" in the United States.

The Appellees argued that "lawful presence" was a "legal term . . . defined by federal law"; that "the responsibility to determine lawful presence [was] singularly held by the federal government"; and that "[w]hether a student [had] 'lawful status' [was] irrelevant" to the determination of whether a student met the residency requirement for in-state tuition. Thus, claiming that they met the requisite "lawful presence" requirement, the Appellees asserted that they were entitled to in-state tuition and mandamus relief.

The superior court held a hearing on the parties' motions,[10] then entered an order on December 30, 2016, denying the Appellants' motion to dismiss and granting the Appellees' motion for summary judgment. The court ruled that

the federal government has made clear that DACA recipients are lawfully present in the United States. The Board of Regents has a policy which requires lawful presence in the United States in order to receive in-state tuition status. The Board of Regents refuses to accept the current

_____

[10] The record does not contain a transcript of the hearing.

9

lawful status that [the Appellees] have been granted. Under the facts asserted in [the Appellees'] complaint this constitutes [the Appellants'] failure to perform a clear legal duty.[11]

The court referred to the designation of the DACA recipients as being "lawfully present" in the United States as a "clear and unambiguous standard" that the Appellants were required to adopt as the definition of "lawful presence" in the Board's official policy. Consequently, the court found that the Appellees were entitled to mandamus relief as a matter of law, and compelled the Appellants "to perform their duty in applying the federal definition of lawful presence as it relates to students who are DACA recipients and to grant them in-state tuition status." This appeal followed.[12]

---

[11] (Footnotes omitted.)

[12] On January 13, 2017, this Court issued an order of supersedeas staying enforcement of the superior court's order while the appeal was pending. After the appeal was docketed in this Court, it was transferred to the Supreme Court of Georgia based on a conclusion that it involved the preemption doctrine of the Supremacy Clause and, thus, fell within the exclusive jurisdiction of the Supreme Court. See Ga. Const. 1983, Art. V1, Sec. V1, Par. II (1); *Babies Right Start*, 293 Ga. at 554 (1) (The Supreme Court of Georgia had jurisdiction over the Appellant's preemption argument pursuant to its constitutional question jurisdiction.); *Ward v. McFall*, 277 Ga. 649, 651 (1) (593 SE2d 340) (2004) (The Supreme Court of Georgia has jurisdiction over whether a state statute is unconstitutional under the Supremacy Clause.). The Supreme Court, however, ruled that the appeal presented no preemption issue and transferred the case back to this Court, where it was re-docketed on March 15, 2017.

C. *Appellate Standards of Review.*

In determining whether the superior court erred in granting summary judgment to the Appellees, the following standard applies.

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment[,] the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[13]

As for determining whether the court erred in denying the Appellants' motion to dismiss the Appellees' petition, we apply the following standard of review.

> [A] motion to dismiss for failure to state a claim upon which relief may be granted should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. If, within the framework of the

---

[13] *Benton*, 280 Ga. at 470 (citations omitted).

11

complaint, evidence may be introduced which will sustain a grant of the relief sought by the claimant, the complaint is sufficient and a motion to dismiss should be denied. In deciding a motion to dismiss, all pleadings are to be construed most favorably to the party who filed them, and all doubts regarding such pleadings must be resolved in the filing party's favor. On appeal, a trial court's ruling on a motion to dismiss for failure to state a claim for which relief may be granted is reviewed de novo.[14]

With these guiding principles in mind, we turn now to the Appellants' specific claims of error.

1. The Appellants contend that the superior court erred in granting the Appellees a writ of mandamus based upon its finding that the Appellees had a clear legal right to in-state tuition and that the Appellants had a clear legal duty to grant them in-state tuition.

> Mandamus is an extraordinary remedy to compel a public officer to perform a required duty when there is no other adequate legal remedy. It is a discretionary remedy that courts may grant only when the petitioner has a clear legal right to the relief sought or the public official has committed a gross abuse of discretion. In general, mandamus relief

---

[14] *GeorgiaCarry.Org v. Atlanta Botanical Garden*, 299 Ga. 26, 28 (1) (785 SE2d 874) (2016) (citations and punctuation omitted).

is not available to compel officials to follow a general course of conduct, perform a discretionary act, or undo a past act.[15]

"The duty which a mandamus complainant seeks to have enforced *must be a duty arising by law*, either expressly or by necessary implication; and the *law* must not only authorize the act be done, but must *require* its performance."[16] In other words, "[w]here the duty of public officers to perform specific acts *is clear and well defined and is imposed by law*, and when no element of discretion is involved in performance thereof, the writ of mandamus will issue to compel their performance. But the mere authorization to act is insufficient unless the law *requires* performance of the duty."[17]

---

[15] *Bland Farms v. Ga. Dept. of Agriculture*, 281 Ga. 192, 193 (637 SE2d 37) (2006) (citation and punctuation omitted); see OCGA §§ 9-6-20 ("All official duties should be faithfully performed, and whenever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance, the writ of mandamus may issue to compel a due performance if there is no other specific legal remedy for the legal rights[.]"); 9-6-21 (a) ("Mandamus shall not lie as a private remedy between individuals to enforce private rights nor to a public officer who has an absolute discretion to act or not to act unless there is a gross abuse of such discretion. However, mandamus shall not be confined to the enforcement of mere ministerial duties.").

[16] *Bland Farms*, 281 Ga. at 193 (citation and punctuation omitted; emphasis supplied).

[17] Id. (citation and punctuation omitted; emphasis supplied).

13

Further, the burden of proving that an opposing party had a clear legal duty to perform in the requested manner falls on the party seeking the writ of mandamus.[18]

Thus, the superior court was not authorized to grant the Appellees' petition for a writ of mandamus unless the Appellees showed that (a) the DACA policy constituted an established and enforceable federal law that designated the DACA recipients as being "lawfully present" in the United States and that this designation applied to the states' determinations of whether the recipients were eligible for in-state tuition, and (b) that the Board's policies create a clear legal duty requiring the Appellants, as public officials, to accept the DHS's designation of DACA recipients as being "lawfully present" in the United States and to grant them in-state tuition on that basis. We conclude that the Appellees have failed to meet this burden.

(a) It is undisputed that, at the time the superior court entered its mandamus order, the United States Congress had not passed a law adopting and codifying the DACA provisions. Instead, the record shows that a federal agency, the DHS, established and implemented the DACA policy in order to defer some deportations

---

[18] See *Alexander v. Gibson*, 300 Ga. 394, 395 (794 SE2d 597) (2016) ("Mandamus will issue against a public official only where the petitioner has demonstrated a clear legal right to relief or a gross abuse of discretion.") (citation and punctuation omitted); *Gilmer County v. City of East Ellijay*, 272 Ga. 774, 776 (1) (533 SE2d 715) (2000).

14

as an exercise of prosecutorial discretion and in an effort to efficiently allocate the agency's resources.

There are no Georgia appellate cases addressing whether the DACA policy carried the force of federal law to the extent necessary to mandate specific action by a state entity. However, in a recent federal case, *Estrada v. Becker*,[19] the United States District Court for the Northern District of Georgia concluded that the DHS's designation of the DACA recipients as being "lawfully present" in the United States did not have the "force of law" that would have required the Board to accept that designation when deciding whether to admit the recipients into the state's colleges and universities. The Court explained that

> federal regulations only have the force of law when they follow certain procedural requirements, like notice-and-comment rulemaking. When Congress authorizes an agency to proceed through notice-and-comment rulemaking, that relatively formal administrative procedure is a very good indicator that Congress intended the regulation to carry the force of law. DACA, notably, did not go through notice-and-comment rulemaking, but was announced through a simple policy memo. Therefore, DACA cannot be said to have gone through the procedural

---

[19] Civil Action File No. 1:16-CV-3310-TWT, 2017 U. S. Dist. LEXIS 73284, 2017 WL 2062078 (N.D. Ga. May 15, 2017).

rigors necessary to demonstrate a clear and manifest purpose of Congress on its own terms.[20]

Thus, we find that the Appellees in the instant case have failed to carry their burden of showing that the DACA policy had the force and effect of a federal law that would support a mandamus order.[21]

---

[20] Id. at *16 (III) (B) (punctuation and footnotes omitted). See *Maricopa County Community College Dist. Bd.*, 395 P3d at 728 ("Congress has not defined DACA recipients as 'lawfully present' for purposes of eligibility for in-state tuition or other state or local public benefits."); *Doe v. St. Louis Community College*, No. ED104574, 2017 Mo. App. LEXIS 691, 2017 WL 2950753, *18 (C) (Mo. Ct. App. July 11, 2017) (The trial court did not err in finding that the petitioner's status as a DACA recipient did not entitle her to in-district tuition. "If DHS, a federal executive agency, had the power to create a new immigration status [through DACA] and confer it upon any individuals it desired, this would be an unconstitutional end-run around the principle of separation of powers.") (citation omitted) ; see also *Texas v. United States*, 809 F3d 134, 146, 176-177 (VI) (B), 181-182 (VII) (5th Cir. 2015), aff'd, *United States v. Texas*, ___ U. S. ___ (136 SCt 2271, 195 LE2d 638) (2016) (per curiam) (The DHS adopted a policy related to DACA, the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program, without complying with federal notice and comment requirements. The Court concluded that implementation of DAPA was properly enjoined because it established substantive criteria regarding immigration that were "manifestly contrary" to the Immigration and Naturalization Act passed by Congress.).

[21] See *Bland Farms*, 281 Ga. at 193. Further, the fact that the Acting Secretary of the DHS was able to unilaterally rescind DACA, as she did on September 5, 2017, without the authorization of Congress, supports a conclusion that DACA was not enacted as a federal law. See footnote 2, supra.

16

Moreover, the superior court based its mandamus order on its conclusion that the federal government had "made clear" that the DACA recipients were "lawfully present in the United States." The only authority cited by the court for that conclusion, however, was "the United States Citizenship and Immigration Services FAQ on DACA which is contained on the official website of the Department of Homeland Security." The court explained that,

> [w]hile an official DHS policy on this question would certainly be beneficial given the unique status of DACA recipients, the statements are nonetheless posted to the public on the official website of the [DHS] and the Court finds they should therefore be taken as accurate representations of the federal government's position.

There is no evidence in the record or citation to legal authority in the court's order or the parties' briefs, however, to support a finding that the general information about DACA, which was posted on the DHS's website in a question-and-answer format and was directed toward the general public, had the force of law as an administrative regulation.[22] Thus, the superior court clearly erred in finding that the information on

---

[22] See *Estrada*, 2017 U. S. Dist. LEXIS 73284, at *16 (III) (B); see also *Gilmer County*, 272 Ga. at 776-777 (1) (finding that the trial court had failed to cite to any legal precedent to support its conclusion that a clear legal duty existed to support its mandamus order and that, absent such authority, the order could not stand).

17

the DHS website, standing alone, was sufficient to create the clear legal duty required to support its mandamus order.

Finally, even if we were to find that the DACA policy had the force of law, in order to support the mandamus order, DACA would not only have had to *authorize* the Appellants to grant the Appellees in-state tuition – DACA would have had to *require* that they do so.[23] However, the official DACA memorandum from the Secretary of the Department of Education specifically stated that, while DACA recipients "*may* be eligible to receive in-State tuition under State law for their enrollment in public postsecondary educational institutions," that determination "*depends on State law and policies*."[24] And, as shown above, the memorandum from the Secretary of the DHS and the DHS website relied upon by the superior court both expressly stated that DACA did not convey to the DACA recipients any substantive

---

[23] See *Bland Farms*, 281 Ga. at 193 ("[T]he mere authorization to act is insufficient unless the law *requires* performance of the duty.") (citation and punctuation omitted; emphasis supplied).

[24] (Emphasis supplied.) See *Maricopa County Community College Dist. Bd.*, 395 P3d at 726 (II) (B) (3) (DACA recipients are not automatically eligible for in-state tuition benefits, and the determination of such eligibility is controlled by state law.).

rights or immigration status.[25] Thus, the Appellees have failed to show that, even if the DACA policy had the force of law, it created a clear legal duty that required the Appellants to grant them the relief they sought.[26]

It follows that the superior court erred in relying on the DACA policy as the basis for granting the Appellees' petition for mandamus.

(b) The Appellees also failed to demonstrate that either state law or the Board's policies[27] requires the Appellants to grant them in-state tuition due to their

---

[25] See *Estrada*, 2017 U. S. Dist. LEXIS 73284, at \*16 (III) (B) ("At most, DACA is a temporary reprieve from prosecution; it does not change a recipient's status and make them eligible for otherwise unavailable benefits. When DHS uses the term 'lawful presence' in DACA, it is using it for the limited purpose of stating that recipients do not accrue 'unlawful presence' for determining later admissibility to the United States. Indeed, the DHS memo announcing the creation of DACA expressly acknowledged that DACA confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. And when given the opportunity to do just that on multiple occasions, Congress has expressly *declined* to do so." Further, nothing in the Immigration and Naturalization Act, 8 USC § 1101 et seq., "suggests that Congress has delegated [to the DHS] the authority to designate an entirely new class of persons as lawfully present.") (punctuation and footnotes omitted; emphasis in original).

[26] See *Bland Farms*, 281 Ga. at 193.

[27] The Georgia General Assembly specifically authorized the Board "[t]o make such reasonable rules and regulations as are necessary for the performance of its duties[.]" OCGA § 20-3-31 (1).

19

designation as being "lawfully present" under the DACA policy. Although Board Rule 4.3.4 requires each University System institution to verify the "lawful presence" in the United States of every student who applies for in-state tuition, the DACA policy did not require that the Board or its institutions accept its designation of recipients as being "lawfully present" for the purpose of determining the recipients' eligibility for in-state tuition, as explained in Division 1 (a), supra. Moreover, even if an institution verifies that a noncitizen student is "lawfully present" in the United States under Rule 4.3.4, that student is not automatically entitled to in-state tuition under the Board's policies. Instead, Board Rule 4.3.2.3 specifically provides that "[a] non[ ]citizen student shall not be classified as in-state for tuition purposes unless the student is legally in this state *and* there is evidence *to warrant consideration* of in-state classification *as determined by the Board of Regents*."[28] Thus, even if the Appellees' designation as being "lawfully present" noncitizens under the DACA policy *could* authorize the Appellants to grant them in-state tuition under Rule 4.3.2.3, the plain language of the rule clearly gives the Appellants broad discretion when considering whether to do so. It follows that the Appellees have failed to show

---

[28] (Emphasis supplied.) See OCGA § 20-3-66 (d) (codification of this rule).

20

that the Board's policies create a clear legal duty requiring the Appellants to grant them in-state tuition.[29]

Consequently, we conclude that the superior court erred in finding that the Appellants had a clear legal duty to grant the Appellees in-state tuition based upon the DHS's designation of DACA recipients as being "lawfully present" in the United States. It follows that the superior court erred in granting summary judgment to the Appellees on their petition for a writ of mandamus.

2. For the same reasons given in Division 1, supra, we also conclude, after viewing the pleadings in the light most favorable to the party that filed them,[30] that the trial court erred in denying the Appellants' motion to dismiss the Appellees' petition.

3. Given our rulings in Divisions 1 and 2, supra, the Appellants' remaining enumerated errors are moot.

*Judgment reversed. Miller, P. J., and Doyle, J., concur.*

---

[29] See generally *James v. Montgomery County Bd. of Educ.*, 283 Ga. 517, 517-518 (661 SE2d 535) (2008) (finding that the trial court properly denied a writ of mandamus because the state statute at issue did not expressly or impliedly impose the duty claimed by the petitioner).

[30] See *GeorgiaCarry.Org*, 299 Ga. at 28 (1).